UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

WANDA RAMOS o/b/o R.R.,                          :

                          Plaintiff,           :

             - against -                  :

MICHAEL J. ASTRUE,                               :
Commissioner of Social Security,

                                :

                         Defendant.
--------------------------------------------------------x

| USDC SDNY |
| :--- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:  __3/12/2013__ |

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
LAURA TAYLOR SWAIN**

11 Civ. 6142 (LTS) (FM)

**FRANK MAAS**, United States Magistrate Judge.

        Pro se plaintiff Wanda Ramos ("Ramos") brings this action on behalf of her minor son, R.R., pursuant to Section 405(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), to seek review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying R.R.'s application for Supplemental Security Income ("SSI") benefits.  (ECF No. 4).[1]  The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (ECF No. 15).  For the reasons set forth below, the Commissioner's motion, to which no opposition has been filed, should be granted.

---

       [1]        In her form complaint, Ramos indicates that R.R is bringing suit "c/o" her. Additionally, she did not redact R.R.'s name to initials as required by Rule 5.2(a) of the Federal Rules of Civil Procedure.  I therefore have modified the caption to conform with the rule.

I.      Background

    A.      Procedural History

        On September 23, 2008, Ramos filed an application for SSI benefits, in

which she alleged that R.R. became disabled on September 1, 2001.  (R. 47, 111-13).[2]

The application was denied.  (Id. at 48-51).  Ramos then requested a hearing before an

Administrative Law Judge ("ALJ"), which was held before ALJ Kenneth Scheer on May

25, 2010.  (See id. at 33-46, 56-57).  Ramos and R.R. appeared at the hearing with

Ramos' non-attorney representative, Jose Vasquez, of Vasquez & Associates.  (Id. at 8,

33, 52).  On September 22, 2010, after reviewing the case de novo, ALJ Scheer issued a

decision denying R.R.'s application for SSI benefits.  (Id. at 15-28).  That ruling became

the final decision of the Commissioner on July 13, 2011, after the Appeals Council denied

Ramos' request for review.  (Id. at 1-3).

---

        [2]      "R." refers to the certified copy of the administrative record filed by the
Commissioner as part of the Answer.  (ECF. No. 11).

B.      Relevant Facts

      1.      Administrative Hearing

           a.      Ramos' Testimony[3]

R.R. was thirteen years old and in sixth grade at the time of the hearing. (Id. at 38, 43). He lived with his mother, sister, and older brother in an apartment in the Bronx. (Id. at 42). Ramos testified that R.R. did not get along with his brother and, although he had friends at school, he was "always fighting with them." (Id. at 44-45). In addition, R.R.'s teacher had called Ramos to report that he was arguing with her and being disrespectful. (Id. at 44).

Ramos testified that R.R. had a "mental disability" and needed to be told things twice in order to understand. (Id. at 43). Even then, R.R. would struggle to understand. (Id.). He had repeated two grades in school, although Ramos did not recall which ones. (Id.). At school, R.R. has a separate teacher who spent four hours with him each day, one-on-one. (Id.). R.R. was able to dress and feed himself, but Ramos prepared his meals. (Id. at 45). Ramos reported that R.R. had suffered seizures in the past, although medication helped to avoid further episodes. (Id. at 44). R.R. also had asthma, and would sometimes get "fatigued" or "very fatigued" when walking or running.

---

[3]      An interpreter was present at the hearing to assist Ramos if she had difficulty understanding the ALJ's questions. (Id. at 35). It is unclear from the written transcript whether the interpreter's services were required at any point.

3

(Id.).  Ramos kept R.R's medications at home, but acknolweged it had been "a while" since he had taken anything for his asthma.  (Id.).

> b.    R.R.'s Testimony

R.R. testified that he walked to school by himself.  (Id. at 39).  He confirmed that he had friends at school, but said that he did not get along with his teacher because "[s]he don't let us talk . . . She only let us talk when she says it's free time."  (Id. at 38).  His two best friends were "Sam" and "Kevin."  (Id.).  R.R. enjoyed talking about movies with his friends, and had last seen "Freddy Kruger" in a theater with his sister and brother.  (Id. at 38-39).  He also enjoyed playing baseball.  (Id. at 39).  His favorite team was the Yankees and his favorite player was Derek Jeter.  (Id.).  After school, R.R. testified that he would "do [his] homework real fast and then lay down and watch T.V."  (Id. at 40).  His favorite show was "Family Guy."  (Id.).  The computer R.R. had at home did not work, but he enjoyed playing games on his Playstation and Wii.  (Id.).

R.R. stated that some of the children at school liked to start trouble with him, but that he did not fight because he was "not a fighting person."  (Id. at 42).  At home, he used to fight with his older brother, but the two were now getting along "a little" since his brother had moved elsewhere.  (Id. at 41).  When his brother was at home, however, they used to fight "all the time," and R.R. stated that he wanted to "beat him up," "kill him when I gr[o]w up," and "punch him in his face every time he bothered me."  (Id.).

4

2.    <u>Medical Evidence</u>

On May 2, 2007, R.R. visited Dr. Jean Robert Mevs, a pediatrician at Urban

Health Plan ("Urban Health") in the Bronx.  (<u>Id.</u> at 258-61).  Dr. Mevs' examination

revealed that R.R. was negative for fever, ear pain, sore throat, cough, asthma, abdominal

pain, vomiting, diarrhea, and constipation, but positive for bedwetting.  (<u>Id.</u> at 259).  He

was "well appearing, well nourished, alert, [and] active."  (<u>Id.</u> at 260).  R.R. reported to

Dr. Mevs that he had asthma that was induced by exercise, but that he had not

experienced coughing, wheezing, or chest tightness at all in the past two weeks.  (<u>Id.</u> at

259).  He took medication for his symptoms less than twice each week.  (<u>Id.</u>).

Dr. Mevs' assessment was that R.R. was a "well child," with "mild

intermittent" asthma and enuresis.[4]  (<u>Id.</u> at 260).  He ordered bloodwork and

immunization, and prescribed Albuterol for asthma and Desmopressin, or DDAVP, for

enuresis.  (<u>Id.</u>).

On December 15, 2007, Ramos took R.R. to the emergency room at Lincoln

Medical and Mental Health Center ("Lincoln Hospital"), after his sister observed him

having "generalized shaking movements" in his sleep.  (<u>Id.</u> at 199-203).  The episode

reportedly had lasted approximately five minutes, during which R.R. experienced

symptoms such as foaming saliva, passing urine, and rolling his eyes.  (<u>Id.</u> at 199).  In

---

[4]    Enuresis is a medical term for "involuntary discharge of urine after the age at which urinary control should have been achieved."  Dorland's Illustrated Medical Dictionary 562 (28th ed. 1994) ("Dorland's").

triage, R.R. was "unresponsive to verbal."  (Id. at 202).  A general review of his body

systems and physical examination, however, revealed normal results.  (Id. at 199).  An

emergency room physical noted that R.R. was in a postictal stage,[5] but that he was

"active, alert, awake, and in no acute distress."  (Id. at 199-201).  R.R. denied head

trauma or toxic ingestion, and stated that he had not had any seizures in the past.  (Id.).

R.R. reported that he attended special school, was able to eat, could speak understandable

sentences, was active, did not need assistance in general, and experienced occasional mild

headaches, although he never was told that he had migraines.  (Id. at 200).  His

neurological examination was normal.  (Id.).  The emergency room records describe R.R.

as having "presented with [his] very first episode of seizure during sleep."  (Id.).  He

diagnosed R.R. with "other convulsions" and recommended follow-up with bloodwork

and consultation with a pediatric neurologist.  (Id. at 200-01).

 The following day, on December 16, 2007, R.R. returned to Urban Health,

where he was examined by Dr. Edna Rodriguez.  (Id. at 264-65).  According to Dr.

Rodriguez's treatment notes, Ramos reported that R.R. had been taken to a hospital after

having a convulsive episode two days earlier.  (Id. at 264).  A general examination

revealed nothing out of the ordinary.  (Id.).  R.R.'s throat was normal, and his lungs and

nose were clear.  (Id.).  Dr. Rodriguez diagnosed R.R. with mild intermittent asthma and a

---

[5] Postictal means "occurring after a seizure or sudden attack."  Dorland's 1340.

"seizure disorder."  (Id. at 264-65).  She prescribed medication for his asthma and referred him to a neurologist.  (Id. at 265).

On December 20, 2007, R.R. went to the Children's Hospital at Montefiore Medical Center ("Montefiore"), where he was examined by Dr. Solomon L. Moshe, a professor of neurology, neuroscience, and pediatrics.  (Id. at 250-52).  In his report, Dr. Moshe indicated that R.R. had suffered a first-time seizure, and stated that he had been "somewhat sleepy" after that, but had returned to normal and had remained that way for the past few days.  (Id. at 250).  Dr. Moshe further noted R.R.'s past history of asthma and "learning disabilities."  (Id. at 251).  He reported that the laboratory tests and CT scan taken at Lincoln Hospital were negative, and that the results of R.R.'s physical examination were normal, except that R.R. apparently had some difficulty following "more complex commands," which needed to be "repeated several times."  (Id. at 250-51).  Dr. Moshe recommended a sleep-deprived electroencephalography test ("EEG") and testing for Fragile X Syndrome.  (Id.).

R.R. returned to Montefiore for a follow-up examination on January 23, 2008.  (Id. at 242-43).  He was examined by Dr. Karen R. Ballaban-Gil, a professor of clinical neurology and clinical pediatrics, and Dr. Tamara Zach, a pediatric neurology fellow.  (Id.).  The doctors noted that R.R. had "learning disabilities" and had experienced a first ever seizure episode in December.  (Id. at 242).  A review of his systems was unremarkable and, on physical examination, he was "awake, alert and oriented, [and]

following all commands." (Id. at 242-43). His EEG results revealed "intermittent polymorphic slowing, delta, left posterior quadrant, and excessive fast activity," which the doctors summarized in the report as "slowing on the left side." (Id.). The doctors recommended an MRI of R.R.'s brain and to follow-up on the Fragile X testing during R.R.'s next visit. (Id. at 243).

On June 12, 2008, R.R. was taken to the emergency room at Lincoln Hospital after he was found lying unresponsive on the floor in the back of a school bus in the early afternoon. (Id. at 190-97). Dr. Steve Ayanruoh examined R.R. on intake. (Id. at 191). Dr. Ayanruoh indicated that his physical examination of R.R. revealed normal results, with the exception of a right temporal hematoma and a bruise on his forehead. (Id. at 193-94). Dr. Ayanruoh diagnosed R.R. with possible syncope[6] and collapse. (Id. at 194-95). He ordered a CT scan and an EKG, and referred R.R. to Dr. Sergey Prokhorov for a neurological evaluation. (Id. at 195).

Dr. Prokhorov conducted a neurological examination that same day, and reported that R.R. was "without any focal deficiencies." (Id. at 190). He noted that R.R.'s past medical history was "significant for asthma," but that his family history was "uneventful" and that R.R. was a "good student." (Id.). Dr. Prokhorov's impression was that R.R. had most likely suffered a seizure episode as a manifestation of a seizure

---

[6]     Syncope is defined as a "temporary suspension of consciousness due to generalized cerebral ischemia." Dorland's 1622.

disorder.  (Id. at 191).  He ordered an EEG and admitted R.R. for observation.  (Id.).  R.R. was discharged the following day.  (Id. at 176-180).  His EKG, EEG, and CT scan all had resulted in normal findings, and he appeared to be "improved and stable" and "doing well."  (Id. at 177, 179).  He was prescribed Lorazepam and Depakote for his seizures. (Id. at 178-79).

On September 5, 2008, R.R. returned to Dr. Rodriguez at Urban Health for a refill of his medication.  (Id. at 262-63).  Dr. Rodriguez reported that R.R. was asymptomatic and that his neurologic exam was "unremarkable."  (Id. at 262).  She noted that she had previously referred R.R. to neurology but that "mom" had missed the appointment.  (Id.).  Dr. Rodriguez further noted that R.R. had been treated for a seizure at Lincoln Hospital, and that he was taking Depakote with no side effects.  (Id.).  She prescribed Albuterol for his asthma and Depakote for his seizure disorder, and referred him again to neurology.  (Id. at 263; see also id. at 216-18).

R.R. appeared for a follow-up appointment at Montefiore on October 28, 2008.  (Id. at 246-47).  Dr. Moshe reported on R.R.'s physical examination, portions of which were performed by Dr. Zach.  (Id. at 246).  Dr. Moshe noted that R.R. had suffered a second seizure in June, but that he had not had any seizures since he began taking Depakote.  (Id.).  The results of R.R.'s MRI and Fragile X testing were normal; his EEG showed "intermittent polymorphic delta left posterior quadrant, excessive fast activity." (Id.).  R.R. had fluent speech and was able to follow all requests during his physical

9

examination.  (Id.).  He continued to have enuresis every night.  (Id.).  Dr. Moshe

summarized his findings by stating that R.R. had a development impairment and epilepsy,

but was "doing well" on Depakote.  (Id. at 247).  He recommended that R.R. continue on

Depakote and visit a behavior clinic before returning for a follow-up appointment in three

months.  (Id.).

On November 4, 2008, R.R. was examined by Dr. William Lathan, a

consultative pediatric physician.  (Id. at 225-28).  Dr. Lathan reported that R.R. had

suffered two seizures and was asthmatic, but that his past medical history was otherwise

unremarkable.  (Id. at 225).  The last time he had used his nebulizer for his asthma was in

2007.  (Id.).  Dr. Lathan indicated that R.R. was in fifth grade special education and had a

history of learning disability.  (Id. at 226).  His examination of R.R.'s neurological,

musculoskeletal, and other body systems revealed no abnormalities, and he determined

that R.R. had no physical or speech impairments.  (Id. at 226-28).  Dr. Lathan further

stated that R.R. was capable of participating fully in all age-appropriate educational and

social activities, but would need close supervision for all activities involving climbing

heights or exposure to water.  (Id. at 228).

On December 3, 2008, R.R. was evaluated by Dr. Dmitri Bougakov, a

consultative child psychologist.  (Id. at 229-32).  Dr. Bougakov noted that R.R. was

currently in fifth grade in a special educational setting, and that he had been receiving

special education since first grade.  (Id. at 229).  Ramos noted that R.R. had learning and

behavioral difficulties, but did not report any symptoms indicative of any attention, concentration, depressive, or thought disorder.  (Id.).  During the evaluation, R.R. was cooperative and "related in an age-appropriate manner."  (Id. at 230).  Dr. Bougakov observed that R.R. had a normal appearance and affect.  (Id.).  His attention and concentration were "intact" and his thought processes were "coherent and goal directed." (Id.).  His sensorium was clear and his mood neutral.  (Id.).  Dr. Bougakov reported that R.R.'s speech was "intelligible and clear," but noted that his "expressive and receptive languages were possibly somewhat below age expectations."  (Id.).  R.R.'s recent and remote memory skills were "borderline," and Dr. Bougakov estimated that his intellectual functioning was in the "average to below average range."  (Id. at 231).  His "general fund of information" was "somewhat limited," and his insight and judgment were "fair."  (Id.). Dr. Bougakov noted that R.R. was able to dress, bathe, and groom himself on a daily basis at an age-appropriate level, but that he did not help around the house or go outside by himself.  (Id.).  He further indicated that R.R. had good friends at school, and that he enjoyed playing basketball and playing video games at home.  (Id.).

Dr. Bougakov stated that R.R. could "attend to, follow, and understand age-appropriate directions, complete age-appropriate tasks, adequately maintain appropriate social behavior, [and] respond appropriately to changes in [his] environment."  (Id.).  He could ask questions and request assistance, was aware of danger, and interacted adequately with peers and adults.  (Id.).  Dr. Bougakov noted, however, that R.R. needed

assistance with learning in school.  (Id.).  He concluded that the examination results

"appear[ed] to be consistent with cognitive problems," but that any such difficulties did

"not appear to be significant enough to interfere with [R.R.'s] ability to function on a

daily basis."  (Id.).  Dr. Bougakov diagnosed R.R. with "epilepsy or seizure disorder,

deferred," and "cognitive disorder, not otherwise specified, related to possibly common

causality of seizure disorder."  (Id.).  He opined that R.R.'s prognosis was "fair," since it

appeared that his cognitive disorder was "relatively mild," and stated that R.R. would be

able to accomplish appropriate vocational and educational goals with appropriate

treatment.  (Id. at 232).

On December 17 and 18, 2008, Dr. K. Prowda, a State agency psychiatrist,

and Dr. R. Mohanty, a State agency pediatrician, reviewed R.R.'s medical records and

completed a "Childhood Disability Evaluation Form."  (Id. at 233-38).  The doctors

concluded that, although R.R.'s epilepsy and learning disability were severe impairments,

they did not meet, or medically or functionally equal, the Listings.  (Id. at 233, 237).  In

reaching that conclusion, they noted that R.R. had difficulties with reading and writing,

and that his cognitive functioning was in the average to below average range.  (Id. at

235).  They also observed that R.R.'s seizures appeared to be controlled by Depakote, and

that he had not experienced any "break through seizures."[7]  (Id. at 236).  The doctors

---

[7]      A breakthrough seizure is a "seizure that occurs despite the use of therapeutic
concentrations of a previously effective antieplieptic drug."  Taber's Medical Dictionary Online,
(continued...)

concluded that R.R. had less than marked limitations in acquiring and using information and in his health and physical well-being.  (Id. at 235-36).  They further found that R.R. had no limitations attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself.  (Id.).

On January 27, 2009, R.R. again was examined by Dr. Moshe at Montefiore.  (Id. at 244-45).  Dr. Moshe noted that R.R. had been seizure-free since his last examination at Montefiore in October 2008.  (Id. at 244).  Ramos reportedly complained about R.R.'s behavioral problems, which included failing to "remember things," refusing to do his homework, hitting Ramos and children at school, and an inability to sit still in class.  (Id.).  Dr. Moshe noted that he had referred R.R. to a behavioral clinic during R.R.'s last visit, but that he and Ramos "did not follow through." (Id. at 245).  He again referred R.R. to a behavioral specialist, and Ramos agreed to make an appointment and return to Dr. Moshe in three months.  (Id.).  At the end of the appointment, Dr. Moshe completed an SSI form at Ramos' request.  (Id.).

R.R. appeared for his follow-up appointment with Dr. Moshe on April 15, 2009.  (Id. at 240-41).  After he and Dr. Zach saw R.R., Dr. Moshe indicated that Ramos was still complaining about R.R.'s behavioral problems, and that R.R. refused to go to the behavioral clinic.  (Id.).  He reported that R.R. hit other children at school, got into fights

---

[7](...continued)
http://www.tabers.com/tabersonline/view/Tabers-Dictionary/745754/all/seizure?q=breakthrough seizures (last visited Mar. 11, 2013).

with his brother at home, and said that he wanted to kill his brother and brother-in-law.

(Id. at 240).  R.R. continued to be in special education, and worked in a group to complete

his homework assignments, but did not read.  (Id.).  He still had enuresis at night.  (Id.).

A physical examination revealed nothing out of the ordinary.  (Id.).  His gait and

coordination both were normal.  (Id. at 241).  Dr. Moshe made note of R.R.'s two seizures

the prior year, but concluded that his condition remained "well-controlled" by Depakote.

(Id.)

On September 23, 2009, R.R. visited Tunesia Mitchell, a physician assistant

("PA") at his school.  (Id. at 266-67).  R.R. complained of chest pain, but denied trauma.

(Id. at 266).  He later admitted that another student had hit him in the chest after he tried

to wrap the student in toilet paper.  (Id.).  PA Mitchell diagnosed R.R. with a contusion to

his chest wall and gave him two tablets of Motrin.  (Id.).  She also noted that R.R. should

return to her office for TDAP vaccination.[8]  (Id. at 267).  R.R. came for the vaccination

the following day, at which time PA Mitchell assessed him as a "well adolescent," but

noted that he was overweight and referred him to a nutritionist.  (Id. at 268-69).

R.R. also was treated at school for a number of minor injuries and pains.

(Id. at 270-74).  On January 12, 2010, R.R. visited the school's medical assistant,

complaining of knee pain when he walked.  (Id. at 272).  On January 20, 2010, he was

---

[8]     The TDAP vaccine "protects against diptheria, tetanus, and pertussis (whooping cough)."  U.S. Nat'l Library of Medicine, Nat'l Institute of Health, Tdap Vaccine: MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/007334.htm (last visited March 1, 2013).

treated by PA Mitchell after reporting stomach pains and diarrhea after eating breakfast.
(Id. at 270-71).  PA Mitchell diagnosed R.R. with abdominal pain, and allowed him to
rest and drink water before sending him back to class.  (Id. at 271).  On January 27, 2010,
he saw the school's medical assistant after being scratched in the chest during gym class.
(Id. at 273).  On March 24, 2010, he was given ice after complaining of wrist pain during
a football game.  (Id. at 274).

On July 2, 2010, after the hearing before ALJ Scheer, Dr. Edward Hoffman,
a consultative psychologist, completed a "Child Organicity Evaluation" at the ALJ's
request.  (Id. at 45, 309-11).  In his report, Dr. Hoffman noted that R.R. was in special
education and had repeated a grade due to academic difficulty.  (Id. at 309).  He noted
further that R.R. was receiving "speech/language therapy and counseling."  (Id.).  Dr.
Hoffman indicated that R.R. "appeared his chronological age," was cooperative,
maintained adequate eye contact, and was neatly attired and groomed, but felt depressed
at times.  (Id.).  R.R. denied having suicidal or homicidal ideation or hallucinations.  (Id.).
R.R. stated that he had friends and that he enjoyed playing baseball, basketball, and
football.  (Id.).  Dr. Hoffman observed that R.R.'s attention and concentration during the
evaluation were adequate and that he was able to follow test directions adequately.  (Id. at
310).  He noted that R.R. was capable of using the telephone, and that he cooked,
shopped, and showered independently.  (Id.).  He took the bus, but not the subway
independently.  (Id.).

As part of the evaluation, R.R. was administered the Test of Nonverbal Intelligence, Third Edition ("TONI-3"), which Dr. Hoffman described as a major test of nonverbal intelligence.  (Id.).  R.R. achieved a quotient of 83, which Dr. Hoffman explained was an indicator for "low average ability."  (Id.).  When presented with arithmetic questions, R.R. showed "adequate" ability.  (Id.).

Dr. Hoffman's overall evaluation was that R.R. had "adequate adaptive functioning and socialization skills" with friends and age appropriate interests.  (Id.).  He stated that R.R. was able to follow age appropriate directions, perform age appropriate cognitive tasks, and relate adequately to others  (Id.).  Dr. Hoffman diagnosed R.R. with "learning problems, by history, with depressive features," asthma, and seizure disorder. (Id.).  His prognosis for R.R. was "fair," and he opined that with "continued intervention and support, he [would] find symptom relief and maximize his abilities."  (Id.).  Dr. Hoffman's concluding recommendation was that R.R. "continue to receive bilingual special education and clinical services for the foreseeable future."  (Id. at 311).

3.      School Evidence

On December 2, 2009, at the request of the Committee on Special Education of the New York City Department of Education, Dr. Mary Singleton, a school psychologist, conducted a psychological evaluation of R.R.  (Id. at 254-57).  The purpose of the evaluation was to "assess [R.R.'s] current level of overall social/emotional, behavioral, and academic functioning and conclude if any change to his current [special education] program was warranted."  (Id. at 254).  Dr. Singleton's report notes that R.R.'s

16

current Individualized Education Program ("IEP") classified him as being "learning disabled" and mandated that he be placed in a "special class full time" within a community school setting, with counseling and speech and language services on a daily basis.  (Id.) (capitalization omitted).  R.R. appeared for testing in two separate one-and-one-half-hour sessions.  (Id.).  He was "cooperative" throughout the evaluation, but reportedly was "overly anxious" and complained of stomach pains during the first session.  (Id.).  He displayed "limited conversational skills for his age," although he answered all questions that were posed to him.  (Id.).

As part of the evaluation, Dr. Singleton performed a clinical interview, vocational assessment, teacher interview, and review of R.R.'s school records.  (Id.).  She also administered the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV") and Woodcock Johnson III ("WJ-III") tests.  (Id.).  R.R. received a WISC-IV composite score of 67, which Dr. Singleton identified as being in the "extremely low" range.  (Id. at 255).  Dr. Singleton noted, however, that R.R.'s "overall intellectual functioning [was] difficult to summarize by a single score" because his nonverbal reasoning abilities were much better developed than his verbal reasoning abilities.  (Id. at 255, 257).  His processing of complex visual information appeared to be a "relative strength," while making sense of complex verbal information appeared to be a "less well-developed ability."  (Id. at 255).  R.R.'s reading skills were assessed to be at the first grade level and thus in the "low average range."  (Id. at 256-57).  His math skills were "a

17

bit more developed," and he had calculation skills at the fourth grade level and applications skills at the second grade level.  (Id. at 257).

Dr. Singleton's evaluation was that R.R. was a "likeable youngster," with "good social skills with his peers and with adults."  (Id.).  She found no major behavioral or emotional issues that interfered with R.R.'s learning in his present setting.  (Id.).  Dr. Singleton observed that R.R. was performing markedly below grade level in reading and math, and that his overall cognitive abilities were "within the mentally deficient range of others his age."  (Id.).  Nevertheless, she again acknowledged that R.R.'s abilities were not easily summarized by his testing scores, and that his nonverbal reasoning abilities were "significantly higher" than his verbal reasoning abilities.  (Id.).

On December 17, 2009, the New York City Board of Education prepared an updated IEP for R.R.  (Id. at 288-302).  The Board's report classified R.R. as having a "learning disability" and recommended that R.R. be enrolled in a special class full time in his community school.  (Id. at 288).  The report further recommended modifying R.R.'s current program to provide forty minutes of speech therapy and forty minutes of counseling.  (Id. at 289).  The IEP provided for "frequent breaks and rest periods" and a "low stimulation environment."  (Id. at 292) (block capitalization omitted).  The report noted that R.R. expressed some behavioral anger and frustrations, but indicated that his behavior could be addressed by his teacher and did not seriously interfere with instruction.  (Id. at 293).  The report identified no mobility limitations, and allowed R.R. to fully participate in all school activities.  (Id. at 294, 302).

18

On May 17, 2010, R.R.'s special education teacher completed an SSI questionnaire which asked her to evaluate R.R.'s "overall functioning."  (Id. at 279-86). She stated that she had known R.R. since September 2009 and saw him for five school periods each day.  (Id. at 279).  In the activities related to "acquiring and using information," she noted that R.R.'s skills primarily fell into the category of a "serious problem."  (Id. at 280).  In the domain of "attending and completing tasks," R.R.'s teacher primarily reported an "obvious problem."  (Id. at 281).  Some of his activities in this domain, such as "sustaining attention during play/sports activities," were "no problem," while "completing class/homework assignments" was a "very serious problem."  (Id.).  In the domain of "interacting and relating with others," R.R.'s activities were reported to be either a "slight problem" or an "obvious problem."  (Id. at 282).  The report indicated "no problem" with any of R.R.'s activities in the area of "moving about and manipulating objects."  (Id. at 283).  In the domain of "caring for himself," R.R.'s abilities ranged from being a "very serious problem" to "no problem" at all.  (Id. at 284).

   4.   The ALJ's Decision

In a decision dated September 22, 2010, ALJ Scheer found that R.R. was not disabled within the meaning of the Act and, therefore, denied his application for SSI benefits.  (See id. at 15-28).  In reaching that conclusion, the ALJ applied a three-step analytical framework for determining whether a child is eligible for SSI benefits.  See 20 C.F.R. § 416.924.

At the first step, the ALJ determined that R.R. had not engaged in substantial gainful activity since the date he applied for SSI.  (R. 18).

At the second step, the ALJ found that R.R.'s learning disorder and seizure disorder were severe impairments which "caused more than minimal functional limitations."  (Id.).  The ALJ found that R.R.'s asthma was not a severe impairment because examining sources reported that it was "well controlled" by medication and because he never had been hospitalized for asthma symptoms.  (Id.).  The ALJ further noted that R.R. had not taken asthma medication or had an asthma attack since 2007.  (Id.).

At the third step, the ALJ determined that R.R.'s learning disorder and seizure disorder did not meet or medically equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.).  The ALJ first considered whether R.R.'s learning disability met the criteria for "mental retardation" under Listing 112.05D.  (Id.).  The ALJ concluded that R.R.'s composite score of 67 on the WISC-IV was "not a valid estimation of [R.R.'s] intellectual ability."  (Id.).  In that regard, the ALJ noted that R.R.'s complaints about stomach pain on the first day of the examination might have negatively impacted his performance.  (Id.).  He also noted Dr. Singleton's observation that R.R.'s overall intellectual functioning was difficult to summarize in a single score, and that his non-verbal reasoning abilities appeared to be far better developed than his verbal abilities.  (Id. at 19).  The ALJ further noted that R.R. had achieved a score of 83 when Dr. Hoffman administered the TONI-3, which placed him in the low average range

20

for non-verbal abilities.  (Id.).  For these reasons, the ALJ chose to ascribe "more weight" to Dr. Hoffman's consultative opinion that R.R.'s impairment did not meet the Listing.  (Id.).

The ALJ further found that R.R. did not have the requisite deficits in adaptive functioning necessary to meet or equal Listing 112.05.  (Id.).  He noted that, although R.R. had been receiving speech and language therapy and counseling since first grade, he liked to play sports and video games, and had many friends at school.  (Id.). The ALJ also cited Dr. Bougakov's evaluation, which indicated that R.R. was capable of dressing, bathing, grooming, and eating at an age appropriate level, and that his speech was "intelligible and clear."  (Id.).  He also noted R.R.'s own testimony that he was capable of cooking, shopping, and taking the bus independently.  (Id.).  In addition, the ALJ stated that the record indicated that R.R. had been "cooperative, attentive[,] and motivated" during his educational and psychological examinations.  (Id.).  Citing with approval Dr. Hoffman's opinion that R.R. "showed adequate adaptive functioning and socialization skills," the ALJ determined that R.R. was able to "adequately cope with common life demands" and, therefore, did not have an impairment that met the Listing. (Id.).

The ALJ next considered whether R.R.'s seizure disorder met the criteria for "major motor seizure disorder" under Listing 111.02.  (Id.).  He concluded without elaboration that the medical evidence did not meet the criteria of that Listing.  (Id.).

21

Finally, the ALJ determined that R.R. did not suffer an impairment or combination of impairments that functionally equaled the Listings.  (Id. at 19-28).  In doing so, the ALJ considered whether R.R. had marked or severe limitations in any of the six functional equivalence domains.  (Id. at 19).  In making his findings, as required by 20 C.F.R. §§ 416.924a(a), 416.926a(b), the ALJ evaluated the "whole child" and "all of the relevant evidence in the case record."  (Id.).

In the domain of "acquiring and using information," the ALJ found that R.R. had less than marked limitations.  (Id. at 22).  He noted that, although R.R. had repeated two grades and had "academic deficiencies" for which he was enrolled in special education, Dr. Bougakov's mental evaluation revealed that R.R. had "coherent and goal directed thought processes" and was able to "attend to, follow and understand age-appropriate directions and complete age-appropriate tasks."  (Id.).  He further cited Dr. Bougakov's opinion that R.R.'s cognitive limitations were "relatively mild" and that his overall intellectual functioning, while in the average to below average range, "did not appear significant enough to interfere with his ability to function on a daily basis."  (Id.).  The ALJ noted R.R.'s score of 67 on the WISC-IV, but found that the score did not adequately represent his intellectual abilities because R.R.'s non-verbal reasoning abilities were "better developed" than his verbal abilities.  (Id.).  The ALJ pointed out that R.R. had received a score of 83 when Dr. Hoffman administered the TONI-III, indicating low average non-verbal abilities.  (Id.).  After noting that R.R. had "demonstrated adequate arithmetic ability," the ALJ concurred with Dr. Hoffman's opinion that R.R.

could perform age-appropriate cognitive tasks.  (Id.).  He thus determined that R.R. had a less than marked limitation in acquiring and using information.  (Id.).

The ALJ next determined that R.R. had less than marked limitations in the domain of "attending and completing tasks."  (Id. at 23).  The ALJ found that, despite reports that R.R. had difficulty concentrating and remaining on task, he was "cooperative and attentive" during academic testing, he had not been diagnosed with attention deficit disorder, and the school records "d[id] not focus on attention difficulties.  (Id.).  He further noted Dr. Lathan's opinion that R.R. had "a normal attention span for his age." (Id.).  Finally, the ALJ found that R.R.'s interests in television and video games indicated that he had "the ability to adequately attend to and complete tasks."  (Id.).

The ALJ next found that R.R. had less than marked limitations in the area of "interacting and relating with others."  (Id. at 24).  While he acknowledged the testimony at the hearing that R.R. had fights with his older brother, the ALJ found that the majority of R.R.'s school records reflected age-appropriate social behavior.  (Id.).  He further cited R.R.'s testimony that he had friends at school and enjoyed playing sports. (Id.).  The ALJ noted Dr. Bougakov's report that R.R. behaved in an age-appropriate manner and that he was "able to maintain appropriate social behavior, respond to changes in the environment, and interact adequately with peers and adults."  (Id.).  In addition, the ALJ agreed with Dr. Lathan's determinations that R.R. "related to himself and to his mother in an age-appropriate manner" and could "participate fully in social activities." (Id.).  Finally, the ALJ noted Dr. Hoffman's evaluation that R.R. had "adequate

23

socialization skills," as well as his teacher's report that he had "no real problem making and keeping friends, playing cooperatively with others, and seeking attention appropriately."  (Id.).

The ALJ next considered whether R.R. had limitations "moving about and manipulating objects."  (Id. at 25).  The ALJ made note of R.R.'s history of asthma and seizures, but found that both were controlled by medication.  (Id.).  He thus credited Dr. Lathan's opinion that R.R. "did not exhibit physical impairments," and "could participate fully in all age-appropriate social and educational activities."  (Id. at 26).  The ALJ acknowledged, however, Dr. Lathan's finding that R.R. may experience occasional periods of "diminished functional capacity" as a result of his asthma symptoms.  (Id.). Considering this evidence together, the ALJ concluded that R.R. had less than marked limitations in this domain.  (Id.).

The ALJ next found that R.R. had no limitations in the domain of "caring for yourself."  (Id. at 27).  In support of that conclusion, the ALJ noted that R.R. was capable of dressing, bathing, and grooming himself in an age-appropriate manner.  (Id.). The ALJ further found that R.R. was able to cook, shop, take the bus and walk to school independently, ask questions, request assistance, and be aware of danger.  (Id.).

Finally, the ALJ determined that R.R. had less than marked limitations in the domain of "health and physical well-being."  (Id.).  Specifically, the ALJ found that R.R.'s asthma and seizures were controlled by medication.  (Id.).  With regard to his asthma, the ALJ noted that R.R. did not need to use medication regularly, had never been

24

hospitalized for symptoms, and had last had an attack in 2007.  (Id.).  The ALJ likewise observed that R.R. had not had an epileptic seizure or episode since he began using medication in 2008.  (Id.).

Based on all of these considerations, the ALJ determined that R.R. did not have an impairment or combination of impairments that functionally equaled one of the Listings.  The ALJ thus concluded that R.R. was not disabled.

II.    Legal Standards

A.    Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision <u>de novo</u>. <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (citing <u>Schaal v. Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998)); <u>Jones v. Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991).  Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence.  <u>See Hickson v. Astrue</u>, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011).  When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position."  <u>Morillo v. Apfel</u>, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

B.    <u>Disability Determination for Children</u>

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The regulations require a three-step evaluation to determine whether a child is disabled.  20 C.F.R. § 416.924; <u>see</u>, <u>e.g.</u>, <u>Martinez v. Astrue</u>, No. 07 Civ. 3156 (WHP) (GWG), 2008 WL 4178155, at *7 (S.D.N.Y. Sept. 8, 2008) (citing <u>Pollard v. Halter</u>, 377 F.3d 183, 189-90 (2d Cir. 2004)).  First, the ALJ must consider whether the child is engaged in work that constitutes "substantial gainful activity," which would automatically exclude her from benefits.  20 C.F.R. § 416.924(b).  Second, the ALJ must determine whether the child suffers from at least one "severe"

26

medically determinable impairment that causes "more than minimal functional limitations." Id. at § 416.924(c).  Third, if the ALJ finds a "severe" impairment, the next inquiry is whether it is the medical or functional equivalent of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix").  Id. at § 416.924(d).  Functional equivalence is demonstrated only if the child exhibits "extreme" limitation in one, or "marked" limitation in two, of the six "domains" established by the regulations.  Id. at § 416.926a(a).  These domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  A marked limitation must "seriously" interfere with a claimant's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2).  It is a limitation that is "more than moderate," but "less than extreme." Id.  An extreme limitation must "very seriously" interfere with a claimant's ability to independently imitate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(3).  Although not necessarily indicative of a total loss of functioning, an extreme rating is given only to the "worst limitations."  Id.

III.   <u>Analysis</u>

      Applying the three-step framework to this case, it is clear that the ALJ's finding of no disability was supported by substantial evidence.

A.   <u>Step One</u>

      The first step requires the ALJ to find that the child has not engaged in "substantial gainful activity" since the date he filed for benefits.  20 C.F.R. § 416.924(b).  There is no evidence in the record that R.R. ever engaged in such activity, and the ALJ's finding that he did not benefits R.R.  Consequently, the ALJ's decision should be upheld.

B.   <u>Step Two</u>

      The second step of the analysis requires the ALJ to determine whether the child suffers from a severe impairment.  20 C.F.R. § 416.924(c).  ALJ Scheer's finding that R.R.'s learning disability and seizure disorder were severe impairments, but that his asthma was not, is supported by the record.  All of the medical evidence shows that R.R.'s asthma was "mild intermittent" and that he experienced symptoms only infrequently.  (R. 225, 259-60).  He was never taken to the emergency room or hospitalized for his asthma.  (<u>Id.</u> at 262).  Moreover, his symptoms were controlled by medication, and R.R. reported he had last needed to use his nebulizer sometime in 2007.  (<u>Id.</u> at 225).  Accordingly, the ALJ's finding that R.R.'s asthma was not a severe impairment is supported by substantial evidence.  <u>See</u> <u>Martell ex rel. Baez v. Astrue</u>, No. 09 Civ. 1701 (NRB), 2010 WL 2891182, at *6 (S.D.N.Y. July 8, 2010) (affirming a finding that claimant's asthma did not constitute a severe impairment where claimant's

symptoms were "mild," "well-controlled by medication," and never required treatment in an intensive care unit).[9]

C.     Step Three

The third step requires the ALJ to determine whether the child has an impairment or combination of impairments that meets or medically equals one of the impairments listed in the Appendix.  If the child does not have an impairment that meets the Listings, the ALJ must further consider whether the child has an impairment or combination of impairments that functionally equals the Listings.  20 C.F.R. § 416.924(d).

1.     Medical Equivalence

a.     Learning Disability

The ALJ correctly determined that R.R.'s learning disability did not meet or medically equal the listing for "mental retardation" under section 112.05D of the Appendix.  Listing 112.05 characterizes mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning."  112.05D requires a claimant to have a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."

_____

[9]     The ALJ did not consider enuresis, but this was not error because Ramos did not raise it as a disability either in her initial application, at the hearing, or in her Complaint.  (See Compl. ¶ 4; R. 35-46, 47, 111).

Notwithstanding R.R.'s WISC-IV score of 67, the ALJ determined that R.R. did not meet the Listing.  (See R. 18).  An ALJ is permitted to reject a claimant's IQ scores as inconsistent with the record as long as he explains his reasons for doing so.  See Davis v. Astrue, No. 7:06-CV-00657 (LEK), 2010 WL 2925357, at *5 (N.D.N.Y. July 21, 2010) (collecting cases); see also Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) ("a valid IQ score need not be conclusive of mental retardation where the score is inconsistent with other evidence of the claimant's daily activities and behavior").  Here, the ALJ considered R.R.'s score but determined that it was "not a valid estimation of [his] intellectual ability," particularly in light of evidence that his non-verbal abilities were far better developed than his verbal abilities.  (R. 18).  Indeed, R.R. scored an 83 when Dr. Hoffman administered the TONI-3, indicating that his non-verbal ability was in the low average range.[10]  (Id. at 310).  Dr. Hoffman further reported that R.R. had "adequate" arithmetic ability.  (Id.).  He concluded that R.R. was capable of performing age appropriate cognitive tasks, and relating adequately to others.  (Id.).  Likewise, Dr. Bougakov found that, although R.R. had a cognitive disorder, it was "relatively mild." (Id. at 231).  Dr. Bougakov opined that, with treatment, R.R. would be capable of

---

[10]     The Appendix provides that it is generally preferable to use IQ measures, but that tests such as the TONI-3 may be used where the child's culture and background are not principally English-speaking.  See 20 C.F.R. Pt. 404, App. 1, Supt. P § 112.00.D.15.  In the Disability Report, Ramos indicated that neither she nor R.R. spoke English, and that R.R. understood only Spanish.  (R. 136).  Administrative notices were sent to Ramos in both English and Spanish.  (Id. at 80-91, 100-04).  An interpreter was also present at the administrative hearing.  (Id. at 35, 110).  In these circumstances, the TONI-3 was an acceptable measure of R.R.'s abilities.

accomplishing appropriate vocational and educational goals.  (Id. at 231).  Finally, as the ALJ noted, Dr. Singleton herself acknowledged that R.R.'s results on the WISC-IV did not adequately summarize his overall intellectual functioning because his nonverbal reasoning abilities were "significantly higher" than his verbal abilities.  (Id. at 257).  In addition, R.R. had reported that he was having stomach pains and was "overly anxious" during Dr. Singleton's first session of testing, which the ALJ thought may have been partly responsible for R.R.'s low score.  (See id. at 254).  Thus, there was substantial evidence upon which the ALJ properly could have disregarded R.R.'s WISC-IV score.

Even if the Court were to assume that R.R.'s WISC-IV score was a representation of his overall abilities, it appears that R.R. still would not have been able to meet the Listing because, as the ALJ correctly noted, he did not demonstrate the deficits in adaptive functioning required by the Listing.  See Talavera v. Astrue, 697 F.3d 145, 148 (2d Cir. 2012) ("[T]o be considered mentally retarded, a petitioner must separately establish deficits in her cognitive and adaptive functioning").  "Adaptive functioning refers to an individual's ability to cope with the challenges of ordinary everyday life."  Id. at 153 (brackets and quotation marks omitted).  Here, the evidence shows that R.R. was able to cope.  R.R. was capable of dressing, bathing, grooming, cooking, shopping, walking, and taking the bus independently.  (R. 230, 310).  He had friends at school, went to the movies, and played sports and video games.  (Id. at 38-40).  Dr. Lathan reported that R.R. related to others in an age-appropriate manner, had a normal attention span, and was capable of participating fully in all age-appropriate educational and social activities.

31

(Id. at 227-28).  Dr. Hoffman similarly concluded that R.R. had "adequate adaptive

functioning and socialization skills."  (Id. at 310).  There consequently was substantial

evidence to support the ALJ's finding that R.R. did not have the deficits in adaptive

functioning necessary to meet the Listing for mental retardation.

        b.        Seizure Disorder

        The ALJ also correctly determined that R.R.'s seizure disorder did not meet

the Listing for "major motor seizure disorder" under Section 111.02 of the Appendix.

"Convulsive epilepsy" requires under Part A of the Listing that the claimant have

experienced "more than one major motor seizure per month despite at least three months

of prescribed treatment."  Under Part B of the Listing, "convulsive epilepsy syndrome"

requires the claimant to have had "at least one major motor seizure in the year prior to

application despite at least three months of prescribed treatment."  Because R.R. had only

two seizures, six months apart, and had not experienced any seizure activity after he was

prescribed medication in June 2008, he does not meet the Listing.  The ALJ's finding thus

was supported by substantial evidence.

        2.        Functional Equivalence

        a.        Acquiring and Using Information

        In evaluating abilities in the domain of acquiring and using information, the

ALJ must assess how well the child learns and uses information.  20 C.F.R.

§ 416.926a(g).  Examples of limitations in this area, although not necessarily indicative of

a "marked" or "extreme" limitation, are:  (i) lack of understanding of words about space,

size, or time; (ii) inability to rhyme words or sounds in words; (iii) difficulty recalling

important things learned in school yesterday; (iv) difficulties answering mathematics

problems; and (v) speech limited to short, simple sentences, and an inability to explain

onself.  (Id. § 416.926a(g)(3)).

    The ALJ's finding that R.R. had only less than marked limitations in this

area is supported by substantial evidence.  The ALJ acknowledged that R.R. was in

special education, had repeated two grades, and had received a low score on the WISC-IV

test, but noted that R.R. had higher non-verbal abilities, was able to perform arithmetic

"adequate[ly]," could perform age-appropriate cognitive tasks, and had coherent and

goal-directed thought processes.  (R. 22).  Although R.R.'s special education teacher

reported that R.R. had some difficulties concentrating and remaining on task, (see id. at

280), the ALJ was permitted to give more weight to Dr. Bougakov's opinion that R.R. did

not have any attention or concentration disorders and that his concentration was "intact"

because this was consistent with other medical evidence in the record.  Indeed, Dr.

Hoffman observed during his evaluation that R.R.'s attention and concentration appeared

adequate and that he was fully capable of following instructions.  (Id. at 310).  Moreover,

Drs. Prowda and Mohanty concluded from their evaluation of the record that R.R.'s

cognitive functioning was in the average to below average range and that he had only less

than marked limitations in acquiring and using information.  (Id. at 235-36).  Finally, the

ALJ was entitled to credit Dr. Hoffman's undisputed opinion that R.R. could perform

age-appropriate cognitive tasks.  (Id. at 310).  Therefore, there was substantial evidence to

support the ALJ's determination that R.R. had less than marked limitations in this domain.

b.   Attending and Completing Tasks

In determining a claimant's abilities in the domain of attending and completing tasks, the ALJ must consider how well the child is able to focus, maintain attention, and carry through with activities.  20 C.F.R. § 416.926a(h).  Some examples of limited functioning in this domain are:  (i) being easily startled, distracted, or overreactive to sounds, sights, movements, or touch; (ii) difficulty focusing on or completing activities of interest to the child, such as games or art projects; (iii) repeatedly getting sidetracked from activities or interrupting others; (iv) being easily frustrated and giving up on tasks; and (v) requiring extra supervision to remain engaged in activities.  Id. § 416.926a(h)(3).

The ALJ's finding of less than marked limitations in this domain is supported by substantial evidence that R.R. was able to concentrate in an age-appropriate manner.  Although R.R.'s teachers reported that he had difficulty concentrating or remaining on task, and Dr. Singleton noted that R.R.'s attention and concentration abilities were in the "extremely low" range, (see R. 255, 280), the ALJ was entitled to give greater weight to three separate medical opinions that suggested the contrary. Specifically, Dr. Lathan opined that R.R. related well to others, had a "normal" attention span, and was capable of participating fully in all age-appropriate educational and social activities.  (Id. at 227-28).  Dr. Bougakov found that R.R. had "no attention [or] concentration" disorder symptoms, and Dr. Hoffman noted that R.R. exhibited adequate

34

attention and concentration during his examination.  (Id. at 229, 310).  Significantly, R.R. never was diagnosed with attention deficit disorder.

As the ALJ noted, the school reports of R.R.'s attention difficulties related primarily to his difficulty "concentrating and remaining on task."  (See id. at 23; see also id. at 257, 293).  However, R.R.'s teacher acknowledged that he had "no problem" sustaining attention during sports activities, and only a "slight problem" carrying out single-step instructions.  (Id. at 281).  R.R.'s own testimony that he enjoyed watching movies, television, and playing video games further suggests an ability to concentrate and remain on task outside of the academic setting.  (Id. at 38-40).  Even at school, R.R.'s IEP was based upon findings that his behavior did not seriously interfere with his instruction and that his difficulties could be addressed by his special education teacher.  (Id. at 293).

In sum, the record reflects that R.R. had difficulties sustaining his attention at school, but that he did not have symptoms suggestive of a broad-based attention deficit disorder or any limitations concentrating on non-academic tasks.  The ALJ's conclusion that R.R. had less than marked limitations in this domain therefore was supported by substantial evidence.

c.      Interacting and Relating with Others

In determining whether a child has limitations interacting and relating with others, the ALJ must consider how well the child is able to initiate and sustain emotional connections with others, develop and use language, cooperate with others, comply with rules, respond to criticism, and respect the possessions of others.  20 C.F.R. § 416.926a(i).

35

Some examples of limited functioning in this area include:  (i) failing to reach out to be picked up or held by a caregiver; (ii) having no close friends, or friends who are not of the same age; (iii) avoiding and withdrawing from people, and exhibiting anxiety or fear about meeting new people and trying new experiences; (iv) difficulty playing games or sports with rules; (v) difficulty communicating to others (e.g. expressing onself or carrying on a conversation); and (vi) difficulty speaking intelligibly or with adequate fluency.  Id. § 416.926a(i)(3).

The record supports the ALJ's finding that R.R. had less than marked limitations in this domain.  Although, as the ALJ noted, R.R. expressed some hostility with regard to his older brother, he had friends at school and enjoyed participating in social activities, such as going to the movies and playing sports.  (Id. at 38-39, 41).  Dr. Lathan opined that R.R. was able to participate fully in all age-appropriate educational and social activities.  (Id. at 228).  Dr. Hoffman noted that he demonstrated adequate socialization skills.  (Id. at 310).  Dr. Bougakov concluded that R.R. was able to maintain appropriate social behavior and respond appropriately to changes in his environment.  (Id. at 231).  Although R.R.'s expressive and receptive languages were "possibly somewhat below age expectations," his overall speech was "intelligible and clear."  (Id. at 230).  R.R. was reported as being cooperative during testing, and Dr. Singleton noted that he "appear[ed] to have good social skills with his peers and with adults."  (Id. at 230, 254, 257).  She further observed that "rapport was easily established with R.R."  (Id. at 254).  Finally, although R.R.'s teacher reported some "slight" problems in the area of playing

cooperatively with others and seeking attention appropriately, and some "obvious" problems in communicating, following rules, and respecting or obeying adults in authority, R.R.'s IEP nevertheless indicated that he should be permitted to participate fully in all school activities, including lunch, assemblies, and trips.  (Id. at 282, 302). Thus, there was substantial evidence to support the ALJ's finding regarding this domain.

d.    <u>Moving About and Manipulating Objects</u>

To assess whether a child has limitations moving about or manipulating objects, the ALJ must consider the child's gross and fine motor abilities.  20 C.F.R. § 416.926a(j).  Some examples of limitations in this area are:  (i) muscle weakness, joint stiffness, or sensory loss; (ii) difficulties climbing stairs; (iii) difficulty coordinating gross motor movements, such as in bending or kneeling; (iv) difficulty sequencing hand or finger movements; (v) difficulty with fine motor movement, such as gripping or grasping objects; and (vi) poor hand-eye coordination when using a pencil or scissors.  Id. at § 416.926a(j)(3).

The ALJ's finding that R.R. had less than marked limitations in this area was supported by substantial evidence.  Indeed, the record demonstrates that R.R. had few, if any, difficulties with his gross or fine motor abilities.  R.R. was capable of playing sports and video games, dressing himself, bathing, taking the bus and walking independently, and grooming himself in an age appropriate manner.  (R. 38-40).  Dr. Bougakov found R.R.'s gait, posture, and motor behavior all to be normal.  (Id. at 230). R.R.'s school teacher reported that he had no limitations manipulating or moving objects.

37

(Id. at 283).  His IEP reported no physical limitations in participating in school activities.

(Id. at 294).  Dr. Lathan opined that R.R. had no physical or speech impairments and

suggested that he was capable of participating fully in all age-appropriate educational and

social activities.  (Id. at 228).  Although Dr. Lathan did note that R.R. might experience

periods of diminished functional capacity due to his asthma, his symptoms were largely

controlled by medication, which R.R. admitted he had not taken since 2007.  (Id. at 225,

228).  Thus, it is clear that there was substantial evidence to support the ALJ's finding

that R.R. had less than marked limitations moving about or manipulating objects.

e.    <u>Caring for Self</u>

In deciding whether a child has limitations caring for himself, the ALJ must

consider how well he maintains a healthy and physical state, how he deals with stress and

changes in his environment, and whether he takes care of his own health, possessions, and

living area.  20 C.F.R. § 416.926a(k).  Examples of limited functioning within this area

are:  (i) continuing to place objects in one's mouth; (ii) use of self-soothing activities such

as thumbsucking, or exhibiting restrictive or stereotyped mannerisms, such as body

rocking or headbanging; (iii) failing to dress or bathe appropriately; (iv) self-injurious

behavior; (v) inability to pursue enjoyable activities or interests spontaneously; and (vi)

disturbances in eating or sleeping patterns.  Id. at § 416.926a(k)(3).

The ALJ's determination that R.R. suffered no limitations in this area is

supported by substantial evidence.  The record shows that R.R. was capable of grooming,

dressing, and bathing himself.  (R. 38-40).  He walked to school and was able to take the

38

bus on his own.  (Id. at 39, 196).  He enjoyed participating in sports, playing video games,

and watching movies.  (Id. at 39-40).  Dr. Bougakov concluded that R.R. ate at an age-

appropriate level and was capable of asking questions, requesting assistance, and being

aware of danger.  (Id. at 231).  Drs. Lathan, Bouogakov, and Hoffman all reported that

R.R. had a normal appearance and appropriate grooming.  (Id. at 226, 230, 309).  He

demonstrated no suicidal or homicidal ideation.  (Id. at 309).  Finally, there is no evidence

that R.R. exhibited any of the regressive behaviors, such as thumbsucking, described in

the Appendix.  The ALJ's finding that R.R. had no limitations in this area therefore was

supported by substantial evidence.

f.    <u>Health and Well-Being</u>

In assessing a child's health and well-being, the ALJ must consider the

"cumulative effects of physical or mental impairments and their associated treatments" on

the child's functioning.  20 C.F.R. § 416.926a(l).  Some examples of limitations in this

domain include:  (i) generalized symptoms such as weakness, dizziness, agitation, or

lethargy; (ii) somatic complaints related to one's impairments (e.g., seizure or convulsive

activity, headaches, incontinence, recurrent infections, or allergies); (iii) physical

limitations due to medical treatments; and (iv) exacerbations from one impairment or a

combination of impairments that interferes with physical functioning.  Id. at

§ 416.926a(l)(3).

The ALJ correctly found that, despite R.R.'s history of asthma and seizures,

he exhibited less than marked limitations in this domain.  As noted previously, R.R.'s

39

asthma was classified as "mild intermittent," and was controlled by medication.  (R. 225, 260).  His symptoms never required hospitalization, and he last needed to take his medication in 2007.  (Id. at 225, 262).  Although Ramos testified that R.R. sometimes would become fatigued when walking or running, there was evidence that he was capable of walking to school by himself and that he played sports, including football, baseball, and basketball.  (Id. at 44, 309).

R.R.'s seizures likewise were well controlled by medication.  (Id. at 241).  At the hearing, Ramos agreed that R.R.'s medication helped him avoid further seizures.  (Id. at 44).  Indeed, he had not experienced a seizure since he began taking Depakote in June 2008.  (Id. at 241).  The medication also did not cause side effects.  (Id. at 262).[11]

R.R.'s IEP shows that neither his asthma nor seizure disorder caused him to have any significant limitations.  The IEP allowed R.R. to participate fully in all school activities and recommended no limitations as a result of medical or health care needs.  (Id. at 294, 302).  Therefore, the ALJ's finding of less than marked limitations in this area was supported by substantial evidence.

---

[11]      Although there was evidence that R.R. had enuresis at night, there was no evidence that he experienced incontinence during the day or that his condition had any impact on his overall functioning.  Thus, R.R.'s enuresis does not to rise to the level of a marked limitation.  See Frye ex rel. A.O. v. Commissioner of Social Sec., No. 5:10-CV-98 (GTS/ATB), 2010 WL 6426346, at *13 (N.D.N.Y. Nov. 12, 2010); Machadio v. Apfel, 98 CV 7633, 2001 WL 477248, at *3 (E.D.N.Y. Mar. 29, 2001).

IV.    Conclusion

For the foregoing reasons, the Commissioner's unopposed motion for judgment on the pleadings, (ECF No. 15), should be granted.

V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Swain.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).


Dated:    New York, New York
          March 12, 2013

                                        _____
                                        FRANK MAAS
                                        United States Magistrate Judge

41

Copies to:

Honorable Laura Taylor Swain (via hand delivery)
United States District Judge

Wanda Ramos o/b/o R.R. (via U.S. Mail)
881 Irvine Street
Apt. 2
Bronx, New York 10474

Susan C. Branagan (via ECF)
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York , New York 10007